IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

SIOUX TRANSPORTATION, INC.                                    PLAINTIFF

v.                      CASE NO. 5:15-CV-05265

XPO LOGISTICS, INC.,
XPO LOGISTICS, LLC, and
GARLAND YARBOROUGH                                            DEFENDANTS

MEMORANDUM OPINION AND ORDER

Currently before the Court is Defendants' Motion to Dismiss for lack of personal jurisdiction and for insufficient process and insufficient service of process. (Doc. 9). The Motion has been fully briefed and is now ripe for decision. For the reasons stated herein, Defendants' Motion to Dismiss is **GRANTED** with respect to the issue of personal jurisdiction. The Motion is **MOOT** with respect to the issues of insufficient process and insufficient service of process. The case is, accordingly, **DISMISSED WITHOUT PREJUDICE**.

I. BACKGROUND

This case arises from two postings made on logistics industry websites in response to a shipment of frozen chicken gone wrong. Plaintiff Sioux Transportation, Inc. ("Sioux") is an Arkansas Corporation located in Washington County, Arkansas. Sioux is a freight broker that obtains orders from shippers and other freight brokers to transport freight for a certain fee. It then contracts with carriers to haul the freight, and pays the carriers for this service. Defendant XPO Logistics, Inc. is a Delaware Corporation with its principal place of business in Greenwich, Connecticut. It acts as a

1

holding company for a number of wholly-owned subsidiaries, including Defendant XPO Logistics, LLC, which is a Delaware LLC with its principal place of business in Greenwich, Connecticut (XPO Logistics, Inc. and XPO Logistics, LLC, collectively "XPO").

In November of 2012, XPO retained Sioux to make arrangements to transport a trailer load of frozen poultry from Gadsen, Alabama, to Monroe, Michigan. Sioux then contracted with a carrier, Original Mamaz Boyz, to transport the load. Upon arriving in Michigan, the frozen chicken was apparently rejected by the consignee because the internal temperature of the chicken was higher than what the product specification called for. Sioux filed a claim for loss pursuant to its own insurance policy and also as an additional insured under Original Mamaz Boyz' policy. Lloyds of London, the insurer on both policies, denied the claims. XPO's insurer, Travelers Property Casualty Company of America, paid for the loss of the product, and then pursued recovery for the loss from Sioux.

Two years later, with the issue of ultimate liability apparently still unresolved, Defendant Garland Yarborough, Director of Brokerage Carrier Compliance for XPO, posted negative statements about Sioux on Carrier 411 and TIA Watch Dog. The purpose of both websites is to provide potential customers information on transportation companies. Yarborough's posting on Carrier 411 identifies Sioux as the "Reported Company," and lists its address as "633 South Barrington Road Springdale, AR 72762." (Doc. 9-1, p. 6). Under "Reported Items," Yarborough includes (i) unauthorized re-brokering of shipment; (ii) theft or unjustified loss of freight; (iii) unresolved claim issues;

(iv) fraudulent activity; and (v) unethical or deceptive business practices. *Id.* Under "Reported Comments," Yarborough writes:

> SIOUX TRANSPORT PICKED UP A LOAD ON 11/07/12 AND DELIVERED ON 11/12/12. THE PRODUCT WAS DAMAGED DUE TO TEMP CONTROL ISSUES. THE LOAD WAS ALSO DOUBLE BROKERED. THE DELIVERING CARRIER'S COVERAGE HAS DENIED CLAIM AND SIOUX'S COVERAGE HAS NOT RESPONDED. WE HAVE MADE NUMEROUS ATTEMPTS IN THE 2 YEARS THAT THIS CLAIM HAS AGED AND NO RESPONSE FROM CARRIER. THIS WAS A 43K CLAIM THAT HAS GONE UNSETTLED DUE TO THE NEGLIGENCE OF SIOUX'S [sic] TRANSPORT.

*Id.* A person named Stephen West, apparently writing on behalf of Sioux, responded to Yarborough's complaint as follows:

> LOAD WAS NO REBROKERED, INFACT XPO BROKERED LOAD, THERE WAS NO LOSS OF FREIGHT. THE ONLY THING ON THIS REPORT THAT HOLDS ANY MERIT IS NUMBER 3. UNRESOLVED CLIAM, THE REST OF THESE ALLOCATIONS ARE JUST NOT TRUE. FRAUDULENT ACTIVITY AND DECEPTIVE BUSINESS PRACTICES. THERE AGAIN SIMPLY NOT TRUE, WE HAVE BEEN IN BUISNESS SENCE 1980, U DONT STAY IN BUISNESS FOR 34 YEARS THATS 12410 DAYS. SIOUX TRANSPORTATION HAS NEVER BEEN SLANDERED BY SUCH ACCUSATIONS LIASTED IN REPORTED ITEMS, THIS HAD A TEMP.
> STEPHEN WEST

*Id.* (all errors in original). The printout of the statement made on TIA Watchdog appearing in the record is almost wholly illegible, except that the statement was made by Yarborough and it identified Sioux as being located in Springdale, Arkansas. (Doc. 9-1, p. 7).

Sioux filed suit in the Circuit Court of Washington County, Arkansas, and XPO removed the case to this Court on October 23, 2015. Sioux's Complaint asserts claims for defamation, false light, a violation of the Arkansas Deceptive Trade Practices Act, and interference with business expectancy. Defendants have responded by filing the

Motion to Dismiss currently before the Court, primarily arguing that this Court lacks personal jurisdiction over them.

## II. LEGAL STANDARD

"To allege personal jurisdiction, 'a plaintiff must state sufficient facts in the complaint to support a reasonable inference that the defendant can be subjected to jurisdiction within the state.'" *Wells Dairy, Inc. v. Food Movers Int'l*, 607 F.3d 515, 518 (8th Cir. 2010) (quoting *Dever v. Hentzen Coatings, Inc.*, 380 F.3d 1070, 1072 (8th Cir. 2004)) (alteration omitted). The Court "must view the evidence in the light most favorable to the plaintiff and resolve all factual conflicts in the plaintiff's favor." *Digi-Tel Holdings, Inc. v. Proteq Telecomm. (PTE), Ltd.*, 89 F.3d 519, 522 (8th Cir. 1996). However, Sioux bears the burden of proving sufficient facts to support a prima facie showing of personal jurisdiction. *Wells Dairy*, 607 F.3d at 518. "The plaintiff's prima facie showing must be tested, not by the pleadings alone, but by the affidavits and exhibits presented with the motions and opposition thereto." *Id.*

The Arkansas long-arm statute authorizes the exercise of personal jurisdiction "to the maximum extent permitted by the due process of law clause of the Fourteenth Amendment of the United States Constitution." Ark. Code Ann. § 16-4-101. Therefore, the only question here is whether the exercise of personal jurisdiction over Defendants is constitutionally permissible. The Due Process Clause allows courts to exercise personal jurisdiction only when a defendant has "certain minimum contacts" with the forum state "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). This standard "presaged the development of two categories of personal

jurisdiction": general jurisdiction and specific jurisdiction. *Daimler AG v. Bauman*, 134 S. Ct. 746, 754 (2014).

General jurisdiction allows a court to hear "any and all claims" against a defendant. *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846, 2851 (2011). In the case of a defendant corporation, the Due Process Clause permits a court to exercise general jurisdiction only when the defendant's "affiliations with the State are so continuous and systematic as to render them essentially at home in the forum State." *Id.* (quotation omitted). "The place of incorporation and principal place of business" are the "paradigm bases for general jurisdiction" over a corporation. *Daimler*, 134 S. Ct. at 760 (alteration and quotation omitted).

"Specific jurisdiction, on the other hand, depends on an affiliation between the forum and the underlying controversy, principally, activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Goodyear*, 131 S. Ct. at 2851 (alteration and quotation omitted). Its exercise is "confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction." *Id.* (quotation omitted). "The inquiry whether a forum State may assert specific jurisdiction over a nonresident defendant 'focuses on the relationship among the defendant, the forum, and the litigation.'" *Walden v. Fiore*, 134 S. Ct. 1115, 1121 (2014) (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 775 (1984)) (internal quotation omitted).

The Eighth Circuit has crafted a five-part test to help the district courts determine whether a defendant has minimum contacts such that a suit does not offend traditional notions of fair play and substantial justice: (i) the nature and quality of contacts with the

forum state; (ii) the quantity of such contacts; (iii) the relation of the cause of action to the contacts; (iv) the interest of the forum state in providing a forum for its residents; and (v) the convenience of the parties. *See Land–O–Nod Co. v. Bassett Furniture Indus., Inc.*, 708 F.2d 1338, 1340 (8th Cir. 1983). The last two factors are of secondary importance, *id.*, and the third factor applies only in the specific jurisdiction context. *See Wilcosky v. Swift Transp. Corp.*, 2008 WL 2562959, *2 (W.D. Ark. June 24, 2008).

### III. DISCUSSION

#### A. General Jurisdiction

Sioux maintains that the Court has general jurisdiction over XPO based on XPO's offices in the state,[1] its ability to transport freight through the state, its potential hiring of employees from the state, and its occasional communication with, and retention of, carriers based in the state. These bases are, however, insufficient to establish general jurisdiction over XPO. As this Court recently recognized, "in recent years, the Supreme Court has clarified and, it is fair to say, raised the bar for general jurisdiction." *Merryman v. JPMorgan Chase Bank, N.A.*, 2015 WL 7308666, *2 (W.D. Ark. Nov. 19, 2015) (alteration and quotation omitted). Thus in *Daimler*, 134 S. Ct. at 746, the Supreme Court held that California did not have general jurisdiction over Daimler despite its assumption that Daimler's exclusive U.S. subsidiary for importing

---

[1] Sioux states that XPO has several offices in Arkansas, while XPO counters that the offices listed on its website as being in Arkansas are actually those of affiliates and subsidiaries, not attributable to XPO. The Court does not consider the matter material to the general jurisdiction question, as it lacks general jurisdiction over XPO either way.

and distributing vehicles was "at home"[2] in the state and that the subsidiary's contacts were imputable to Daimler. The subsidiary was the largest supplier of luxury vehicles to California, and had large offices in the state. *Id.* at 752. Still, the Supreme Court found that a formulation of general jurisdiction that would subject Daimler to suit in California based on conduct unrelated to that state would be "unacceptably grasping" such that Daimler would be subject to such a suit in any state in which it had sizeable sales. *Id.* at 761. That is of particular concern, this Court notes, in light of the nationally, and indeed globally, interconnected economy in which corporations now operate.

Instead, Due Process requires a corporation to be "essentially at home in the forum State" for a court to have general jurisdiction over it. *Id.* (quoting *Goodyear*, 131 S. Ct. at 2851). *Daimler* makes clear that rarely, if ever, will a corporation be "at home" in a state in which it is not incorporated or does not have its principal place of business. Given the limited scope of XPO's contacts with Arkansas, this certainly is not such a case.

### B. Specific Jurisdiction

Sioux first contends that the Court has specific jurisdiction over XPO by virtue of the business relationship between the parties. XPO has benefited from services provided by Sioux in Arkansas, communicated with Sioux's Arkansas staff, and contracted for services to be performed in Arkansas. As support for its contention that these contacts are sufficient to create specific jurisdiction, Sioux primarily relies on cases sounding in breach of contract. *See Burger King Corp. v. Rudzewicz*, 471 U.S.

---

[2] The Court assumed that the subsidiary was "at home" in California despite it being a Delaware Corporation with its principal place of business in New Jersey because Daimler failed to object to that finding below. *Id.* at 758.

7

462 (1985); *Wessels, Arnold & Henderson v. Nat'l Med. Waste, Inc.*, 65 F.3d 1427 (8th Cir. 1995); *Northrup King Co. v. Compania Productora Semillas Algodoneras Selectas, S.A.*, 51 F.3d 1383 (8th Cir. 1995); *Caesar's World, Inc. v. Spencer Foods, Inc.*, 498 F.2d 1176 (8th Cir. 1974); *J & V Rest. Supply & Refrigeration, Inc. v. Supreme Fixture Co.*, 76 Ark. App. 505 (2002). In such cases, the defendants' contacts with the forum state pursuant to the negotiation, entering, and performance of the contract bear an incredibly close relation to the cause of action. This tight nexus is precisely why in-state plaintiffs can often maintain breach of contract actions against out-of-state defendants without running afoul of the Due Process Clause. Assuming the quality and quantity of the contacts are sufficient, the Eighth Circuit's five-part test will almost always be met, given how the aforementioned nexus satisfies the test's third, "relatedness," prong.

This, however, is not a breach of contract case. Instead it is a defamation case[3] involving two online posts made by an XPO employee after a single transaction with Sioux went awry. XPO's underlying conduct—its contact with Arkansas during its business relationship with Sioux—is much less closely related to the causes of action in this case than it would be in a breach of contract case. Moreover, XPO's contact with Arkansas was *de minimis*. While XPO contacted Arkansas by communicating with Sioux, mail and telephone contacts "alone are insufficient to confer personal jurisdiction . . . ." *Wessels*, 65 F.3d at 1433. Though such communications "remain a consideration" in the analysis, in this case they arguably do not provide evidence of "a continuous, systematic business relationship" that would permit the exercise of specific jurisdiction even in a breach of contract action, let alone a defamation case. *Id.* This is so because

---

[3] The Court uses the term "defamation" as shorthand to refer to all of the counts in this case, which all arise out of the online posts.

8

most of the performance related to the parties' agreement occurred outside of Arkansas, on the road from Alabama to Michigan. Aside from XPO's communications with Sioux, the only other act performed in Arkansas was Sioux's coordination with Original Mamaz Boyz to transport the frozen poultry. Given the limited nature of XPO's contacts with Arkansas, and given the attenuation of those contacts from the cause of action, the first three prongs of the Eight Circuit's minimum contacts test are lacking.

Sioux also argues that the Court has specific jurisdiction over XPO and Yarborough based on Yarborough's online posts. It asserts that these posts are attributable as contacts to Arkansas due to the effects that the posts caused in the state. This formulation comes from *Calder v. Jones*, 465 U.S. 783 (1984). In *Calder*, actress Shirley Jones sued the National Enquirer and related persons for libel in California state court. Although the defendants were all residents of Florida, the Supreme Court held that California had jurisdiction over them because their allegedly tortious actions were "expressly aimed at California." *Id.* at 789. Defendants knew that the article in question "would have a potentially devastating impact upon [Jones]. And they knew that the brunt of that injury would be felt by [her] in the State in which she lives and works and in which the *National Enquirer* has its largest circulation." *Id.* at 789-90.

Sioux seizes on this language from *Calder* and asserts that the instant case is favorably analogous to it. However, as Sioux recognizes in its Response Brief, Doc. 15, p. 12, the Eighth Circuit "construe[s] the *Calder* effects test narrowly . . . ." *Johnson v. Arden*, 614 F.3d 785 (8th Cir. 2010). In *Johnson*, the Eighth Circuit explained that *Calder's* effects test provides that

> a defendant's tortious acts can serve as a source of personal jurisdiction only where the plaintiff makes a prima facie showing that the defendant's acts (1) were intentional, (2) were uniquely or expressly aimed at the forum state, and (3) caused harm, the brunt of which was suffered-and which the defendant knew was likely to be suffered-in the forum state.

*Id.* at 796 (quoting *Lindgren v. GDT, LLC*, 312 F. Supp. 2d 1125, 1132 (S.D. Iowa 2004)) (alteration omitted). It then applied this standard to facts strikingly similar to the instant case. The plaintiffs in *Johnson* were a company and its owners who operated a cat breeding business, called the Cozy Kitten Cattery, out of Missouri. *Id.* at 788. They sued, among other parties, Kathleen Heineman, a Colorado resident who had a past business relationship with the plaintiffs. Specifically, between 2002 and 2006, Heineman purchased 16 cats on the plaintiffs' behalf, at times delivering them to Missouri, and also purchased approximately 50 advertisements on their website. *Id.* at 788-89. Sometime later, Heineman allegedly posted defamatory statements about the plaintiffs on www.ComplaintBoards.com. She wrote that "Sue Johnson and Cozy Kittens operated from Unionville, Missouri, where they killed cats, sold infected cats and kittens, brutally killed and tortured unwanted cats and operated a 'kitten mill' in Unionville, Missouri." *Id.* at 796. Although Heineman, like Defendants in this case, specifically identified the location of the plaintiffs' business, the *Johnson* Court found that the statement

> fails to show that Heineman uniquely or expressly aimed her statement at Missouri. The statements were aimed at the Johnsons; the inclusion of "Missouri" in the posting was incidental and not performed for the very purpose of having their consequences felt in Missouri. There is no evidence that the www.Complaints Board.com website specifically targets Missouri, or that the content of Heineman's alleged postings specifically targeted Missouri.

*Id.* (quotation omitted). Additionally, *Johnson* explained, "even if the effect of Heineman's alleged statement was felt in Missouri, we have used the *Calder* test merely

10

as an additional factor to consider when evaluating a defendant's relevant contacts with the forum state." *Id.* at 796-97. In looking for other contacts to Missouri, the *Johnson* Court apparently did not consider Heineman's prior business relationship with the plaintiffs to be relevant, as it found that there were "no additional contacts between Heineman and Missouri to justify conferring personal jurisdiction." *Id.* at 797.

Both *Johnson* and the instant case involve allegedly defamatory statements made online from another state; both involve statements that identify the plaintiffs' location; and both involve parties that had, at least at one time, a business relationship. Given these similarities, there is no basis upon which this Court can materially distinguish *Johnson* to justify a departure from its holding. The Court therefore finds that Sioux cannot establish that Defendants had minimum contacts with Arkansas through the *Calder* effects test.

Finally, the parties dispute whether the well-known *Zippo* test is helpful to determine specific jurisdiction in this case. The *Zippo* test comes from *Zippo Mfg., Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119 (W.D. Penn. 1997). In one of the most widely cited district court cases in the country,[4] Zippo Manufacturing brought a trademark dilution action against Zippo Dot Com over its use of "Zippo" and registration of several domain names including that word. *Id.* at 1121-22. Zippo Dot Com was located in California, and so the court had to determine whether Zippo Dot Com's operation of a website accessible in Pennsylvania created jurisdiction in that state. To answer this question, the court crafted a "sliding scale" based on "the nature and quality of commercial activity that an entity conducts over the Internet." *Id.* at 1124. On one end of

---

[4] According to Westlaw, as of the writing of this Opinion, the case has been cited 5,699 times.

the scale "are situations where a defendant clearly does business over the Internet. If the defendant enters into contracts with residents of a foreign jurisdiction that involve the knowing and repeated transmission of computer files over the Internet, personal jurisdiction is proper." *Id.* On the other end are "situations where a defendant has simply posted information on an Internet Web site which is accessible to users in foreign jurisdictions. A passive Web site that does little more than make information available to those who are interested in it is not grounds for the exercise [of] personal jurisdiction." *Id.* Finally, "[t]he middle ground is occupied by interactive Web sites where a user can exchange information with the host computer. In these cases, the exercise of jurisdiction is determined by examining the level of interactivity and commercial nature of the exchange of information that occurs on the Web site." *Id.*

The Eighth Circuit has found the *Zippo* test helpful to determine the sufficiency of internet contacts under the specific jurisdiction analysis. *Johnson*, 614 F.3d at 796. Indeed, *Johnson* controls the outcome of the *Zippo* inquiry in this case. *Johnson* found that www.ComplaintsBoard.com, a website clearly similar to the ones in this case, fell on the passive end of the sliding scale. *Id.* It noted that although the owner of www.ComplaintsBoard.com represented it as an interactive website, "users may actually only post information. There is no interaction between users and a host computer; the site merely makes information available to other people." *Id.* Accordingly, Sioux cannot rely on the *Zippo* test to establish this Court's jurisdiction over Defendants.[5]

---

[5] Sioux actually reaches a similar outcome in its Response Brief. It insinuates that the *Zippo* test is inapplicable to this case because that test applies to the owners and

12

In the instant case, the Court had the difficulty in considering the *Zippo* test in the context of the modern internet. The internet has undergone tremendous change since *Zippo* was decided in 1997, and even since *Johnson* in 2010. Cloud computing has eliminated the need for downloading files in many situations, location-based technology has made online interactions that formerly existed only in cyberspace more closely tied to specific geographic locations, and the level of user interaction with websites has exploded with social media. All of this calls into question the modern usefulness of the *Zippo* test's simplistic tri-parte framework: The transmission of computer files over the internet is perhaps no longer an accurate measurement of a website's contact to a forum state.

This latter change—the increased level of user interaction—presents particular challenges in applying the *Zippo* test in the context of a defamation case brought against a user of a website, not the website's owner. First, whether the website that the user posted to is engaged in commercial activity is plainly inapposite to the *user's* contact to the forum jurisdiction. For example, a user could libel an online product in the review section of the website on which it is sold—a website that would clearly be engaged in online commercial activity. Or, the same user could libel the product on a widely-read message board that lacks any commercial purpose. The commercial nature of the underlying website in that example is irrelevant to the manner in which *the user* contacts, or does not contact, the forum state.

---

operators of websites, not to users of the sites. Sioux instead relies on the *Calder* effects test, discussed *supra*.

The distinction between the passive and interactive categories on the *Zippo* scale is irrelevant to the user-based defamation inquiry as well,[6] as a passive website, by definition, would not allow a user to post content. This means that any defamation case against a user will involve an interactive website, falling in the middle of the *Zippo* scale.

For these reasons, it is this Court's opinion that if the *Zippo* scale is to be applied in the user-based defamation context at all,[7] it should focus not on the nature of the underlying website, but on the nature of the content posted by the user. The Court believes that this was the conclusion that the *Johnson* Court implicitly came to when it held that Heineman's post was passive. Such a conclusion explains how the *Johnson* Court reached that decision when, clearly, the underlying website was interactive, as it allowed users to interact with the site by posting information on it. However, the content posted by Heineman in that case was clearly passive, justifying the resultant finding of no specific jurisdiction. Accordingly, whether the Eighth Circuit applies the *Zippo* test in

---

[6] This distinction may, additionally, be categorically outdated at this point. When the *Zippo* Court was writing, the internet was comprised in large part by websites that simply posted information. Today, however, most websites have interactive features. *See* Dennis T. Yokoyama, You Can't Always Use the Zippo Code: The Fallacy of A Uniform Theory of Internet Personal Jurisdiction, 54 DePaul L. Rev. 1147, 1167 (2005).

[7] The better approach, in light of today's internet, may be to scrap the *Zippo* test in the context of online defamation altogether, and to instead rely solely on the *Calder* effects test. *See* Patrick J. Borchers, Internet Libel: The Consequences of A Non-Rule Approach to Personal Jurisdiction, 98 Nw. U. L. Rev. 473, 489 (2004) (arguing that courts should disregard *Zippo* in online libel cases because "the degree to which the reader can interact with the producer of the allegedly libelous statements has little relevance."); Yokoyama, *supra* note 6, at 1176 (arguing that "the Zippo test is inappropriate because the interactivity of the site, or lack thereof, may have little or nothing to do with the harm suffered by the plaintiff and thus should have little or no relevance in determining personal jurisdiction in a defamation case.").

the defamation context to the underlying website, or to the user's content, Defendants have not had sufficient contact with Arkansas to confer jurisdiction upon this Court.

### C. INSUFFICIENT PROCESS AND INSUFFICIENT SERVICE OF PROCESS

Since Defendants' Motion to Dismiss was filed, Sioux properly served notice to Yarborough. (Doc. 13). This, along with the fact that the Court lacks jurisdiction over this case, renders Defendants' argument moot.

### IV. CONCLUSION

For the reasons stated herein, Defendants' Motion to Dismiss is **GRANTED** with respect to the issue of personal jurisdiction. The Motion is **MOOT** with respect to the issues of insufficient process and insufficient service of process. The case is, accordingly, **DISMISSED WITHOUT PREJUDICE**.

**IT IS SO ORDERED** on this 22nd day of December, 2015.

TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE